**Seth Seiders, Appellee, v. Charles F. Henry, Appellant.**

**Gen. No. 34,266.**

428

Heard in the first division of this court for the first district at the April term, 1930.

Opinion filed December 22, 1930. Rehearing denied January 5, 1931.

ALDEN, LATHAM & YOUNG, for appellant; HOBART P. YOUNG and SIDNEY F. MOODY, of counsel.

WILLIAM L. KELLEY and JOHN W. MARSHALL, for appellee.

MR. PRESIDING JUSTICE MATCHETT delivered the opinion of the court.

This is an appeal by defendant from a judgment in the sum of $23,894.72 entered upon the finding of the court.

Plaintiff sued for the return of moneys to the amount of $20,000 paid by him under the terms of a written contract in and by which he agreed to purchase a bungalow in a co-operative apartment building and for damages sustained by him in connection therewith.

Plaintiff's statement of claim avers that defendant failed to perform his part of the contract; that defendant agreed to return the money, which he failed to do, and that this money was obtained by false representations.

The affidavit of merits denies that defendant defaulted in the performance of the agreement; denies that he made any false representations, and asserts that plaintiff was at fault in that, without just cause, he refused to perform the contract.

At the close of all the evidence a motion to find for defendant was denied. Propositions of law were submitted by defendant. A greater number of these were refused, but by the 9th proposition the court held, correctly, we think, "that where a party has advanced money, or done any other act in part performance of any agreement, and then refuses to proceed to carry out the other terms of the agreement, the other party being ready and willing to fulfil all the obligations imposed upon him by such agreement, he cannot recover back the money thus advanced, nor recover damages for any acts done by him in pursuance of said agreement." *Wheeler v. Mather,* 56 Ill. 241; *Bryson v. Crawford,* 68 Ill. 362; *Harlow v. Snow,* 147 Ill. App. 369, and *Hansbrough v. Peck,* 5 Wall. 497, 18 L. Ed. 520, are a few of the cases which so hold. The finding of the court was, however, in favor of plaintiff as heretofore stated, and defendant contends that the finding and judgment are against the evidence and contrary to the law, and further that the court erred in the assessment of damages.

The agreement upon which the suit is based was made February 15, 1927, and was in the form of a writing signed by plaintiff, addressed to defendant and accepted by him. As the determination of the controversy depends upon the construction of this agreement we set it out verbatim:

"Proposition.

"Chas. F. Henry,
201 East Delaware Place,
Chicago, Illinois.

"I hereby agree to purchase from you the bungalow located on the roof of the eighteenth floor of the build-

ing known as 201 East Delaware, for the sum of Eighty-four Thousand ($84,000.00) dollars, payable as follows:

$30,000.00 on delivery of stock and 99-year lease and purchase agreement

20,000.00 on or before May 15, 1927

20,000.00 on or before August 15, 1927

14,000.00 on or before November 15, 1927,

together with 6 per cent interest on all unpaid balances.

"It is further understood and agreed that you are to build me an additional maid's room attached to and adjoining the present room for which I am to pay Five hundred ($500.00) Dollars in the event this shall cost more than Three Thousand ($3,000.00) Dollars; should the cost be less than Twenty-five Hundred Dollars ($2,500.00) I am to pay nothing.

"Assessment to be arranged by attorneys for both parties on square foot basis.

"It is further understood and agreed the bungalow is to be finished immediately, according to the original plans and specifications from which there will be no deviation except upon my consent.

"It is understood and agreed that you are to arrange my interest in the corporation, so that in the event of a complete sale of the building I am to receive the pro-rated share of the receipts as 840 compared to 8,200.

(Signed)    Seth Seiders.

"Accepted

Chas. F. Henry

By C. J. Williams."

The construction to be given to the terms of the contract of the parties will be clarified by a recital of certain facts and circumstances which were well known by both parties at the time of its execution, which, as already stated, was February 15, 1927.

Defendant Henry was at that time in Florida and plaintiff Seiders in Chicago. The negotiations for the sale of the bungalow were therefore conducted by defendant Henry through his agent, C. J. Williams.

The bungalow was located on the top of the building known as the Two-O-One East Delaware Place Building, a corporation with that name having been organized under the laws of the State of Illinois by defendant Henry. It had a capital stock of $820,000, consisting of 8,200 shares of a par value of $100. The corporation owned the land and the building, the latter of which consisted of 125 apartments. Defendant originally owned the land, but he transferred it to the corporation, receiving in payment therefor the entire capital stock. Through mortgages upon the land and upon the building to be erected, funds were secured to construct the building, and the equity in the property was appraised at the par value of the stock, namely, $820,000. Defendant held all the shares except two, which were held by a brother and sister respectively, who thus qualified as directors of the corporation and who, together with defendant, constituted the board of directors.

The plan of the organization of the corporation was to apportion the equity in the property among the apartments in proportion to the size and location of each, and this was brought about by allotting to each apartment its supposed equitable share of the entire capital stock of the corporation. A schedule showing such allotments was filed with the secretary of state. The operating expenses, taxes, etc., were provided for by means of a monthly assessment against each apartment based upon the number of shares of the stock allotted to it. This assessment had been estimated and fixed by resolution of the board of directors, who, as already stated, consisted of defendant and his brother and sister. This resolution provided that such assess-

ment should be the sum of $1.27 per share each month. If the owner of an apartment held a large number of shares of stock his monthly assessment was therefore proportionately large, and if the number of shares held by an owner was small, the assessment he was required to pay was proportionately less. The bungalow had been originally intended to be owned and used by defendant Henry, and for the purpose of making his assessment small only 130½ shares of stock of the building corporation had been allotted to this bungalow. When plaintiff made his first payment on February 15, 1927, he was informed by Williams, defendant's agent, that only 130½ shares of stock went with the bungalow. He was also told at that time that Mr. Williams did not believe that defendant would sell the bungalow for $84,000 if the assessment paid by the purchaser was to be made on the basis of only 130½ shares of stock, since in that case the assessment would amount to only approximately $165 a month. On the other hand, if 840 shares of stock, the amount which normally and ordinarily would have been allotted to the bungalow, were delivered to plaintiff, his assessment upon the same basis as other apartments would amount to over $1,000 a month. The situation therefore was that defendant did not wish to sell the bungalow on the basis of an allotment of 130½ shares of stock for the reason that this would make the assessment of plaintiff too small. On the other hand, plaintiff did not wish to accept an allotment of 840 shares of stock because this would make his assessment too large. In order to meet this situation there was inserted in the contract the provision: "Assessment to be arranged by attorneys for both parties on square-foot basis." The parties knew that an assessment on such basis would amount to about $675 a month. This plan, if unmodified, was, however, subject to the objection that in case the whole building should be sold or in case it would be destroyed by fire, with plaintiff

holding only 130½ shares of the stock of the corporation, his shares in the proceeds would be only in proportion to the amount of stock held by him, and as it was the desire of the parties that plaintiff should have an interest in the property in the ratio of 840 to 8,200, the last paragraph was inserted in the contract which provided: ·

"It is understood and agreed that you are to arrange my interest in the corporation, so that in the event of a complete sale of the building, I am to receive the pro-rated share of the receipts as 840 compared to 8,200."

The usual manner in which a conveyance of an interest in this building was accomplished was through two written agreements, copies of which are attached to plaintiff's statement of claim. One of these is described as "an agreement of purchase of stock," which in substance it is. The other is described as a "proprietary lease" which is for the term of 99 years. Both parties were familiar with the terms of these two written documents, and it was their intention that the transfer of the bungalow should be made by executing the same, supplemented by the arrangement of the attorneys as to the assessment and an arrangement by the vendor by which the interest of plaintiff in the corporation would be preserved in the proportion of 840 as compared to 8,200 when the property should be sold.

Defendant was in Florida on February 15, and his return to Chicago was not expected until March 1, 1927. Defendant's agent, Mr. Williams, however, kept in touch with defendant by telephone, telegrams and letters. A short time after the contract was signed plaintiff requested permission of the agent to go into possession of the bungalow, but since there was a balance of $10,000 due on the initial payment and the lease and stock purchase agreement had not as yet been executed, defendant did not give his consent.

Plaintiff, however, testifies that the agent gave him permission to go in, and the evidence shows that he did go in and lay down carpets, which were afterwards removed, for injury to which the court allowed damages. On the other hand, Williams, the agent, testified that he did not give his consent; that he told plaintiff he would get in touch with defendant to see if it would be all right but that plaintiff said he wanted to move in and take a chance that it would be all right with defendant; that he, Williams, asked plaintiff to wait one more day, but that plaintiff called him the next day and said that he had ordered the wagons and was going to move in and was perfectly willing to take a chance that it was all right. Williams says, ''I told him to come ahead if he wanted to take a chance; that I could not stop him.''

It is clear that the terms of the contract did not give plaintiff the right to enter the bungalow before the execution of the lease and of the agreement for the sale of the stock, and we think his testimony to the effect that he was granted permission to enter is improbable and not sustained by the evidence.

At this time only ten or twelve of the apartments had been sold and defendant was still the owner of 7,000 shares of the stock.

A clear preponderance of the evidence indicates that after the contract was signed the assessment was arranged by the attorneys for the respective parties on a square foot basis and the amount definitely fixed at $675 a month. Mr. Charash, who at that time acted as attorney for defendant, testifies that sometime in the middle of February, 1927, he met plaintiff by appointment and that Mr. Williams was also present; that plaintiff then said to him that as he understood it he was to pay $675 a month, and that he was paying on a different basis from the average tenant and asked the witness if that was not so, to which the witness responded that it was; that a few days thereafter the witness

called upon plaintiff's attorney, Mr. Marshall, who informed him that as far as the $675 assessment was concerned the same was agreeable to plaintiff. Defendant testifies that he met plaintiff on March 3, 1927, and that plaintiff at that time said that he would pay the $675 assessment per month. The evidence of these witnesses on this point is uncontradicted in the record, and the facts must therefore be regarded as established.

It is not contradicted (in fact it is established by the evidence of plaintiff) that on March 3, 1927, plaintiff refused to go ahead with the contract; that he said to defendant:

"I don't like the looks of it. I don't like the looks of the whole deal. I don't like the looks of your letting me put carpet in and not letting me move in and I don't like the way you are stalling around and I want my money back."

Plaintiff gives as a further reason for refusing to carry out the contract his objection to defendant's proposition that his interest in the whole building should be protected through the deposit by defendant of an additional number of shares, 710, in escrow in order to comply with the last clause of the contract. The controlling question in this case, we think, is whether the offer of defendant to deposit this stock in escrow with a trust company for the benefit of plaintiff, so that in the event of the sale of the building he would receive his share of the net receipts in proportion of 840 as compared to 8,200, was a compliance with the terms of the contract. The record shows that on March 14, defendant notified plaintiff that he was waiting for the $10,000 balance due on the initial payment in accordance with the terms of the agreement. The notice further stated:

"The stock certificates, the purchase agreement and proprietary lease on said bungalow are being held for you and same will be delivered as soon as I have your

payment of $10,000 and execution of purchase agreement and proprietary lease by you, the same having been executed by me.

"I am in hopes that you will see fit to complete this transaction without any further delay."

The contention of plaintiff is that under the terms of this contract he was entitled to receive 840 shares of stock absolutely on the bungalow purchase and that the agreement to place the additional shares to make a total of that amount in escrow for his benefit is not a compliance with the terms of the contract. If it had been the intention of the parties that there should have been a delivery of 840 shares absolutely, it is difficult, indeed, to understand the reason for the last paragraph of the contract. Plaintiff testifies that he demanded the delivery of 840 shares, the necessary effect of which would have been to impose an assessment in an amount which he, himself, says it was agreed that he should not pay. He makes no suggestion of any interpretation of the contract other than that he was to receive 840 shares of stock absolutely—a proposition inconsistent with his own testimony and, we think, with any fair construction of the language of this contract.

It is, however, urged that the proposal to escrow the 710 shares is inconsistent with the provision of the lease to the effect:

"The stock owned by leaseholders of the building is irrevocably and continuously pledged by the purchaser, to the owner, (The Corporation) as security for assessments, etc., from time to time levied by the Board of Directors."

We do not regard this provision as requiring the physical pledge of the stock certificates to the corporation. Its only effect, as defendant suggests, is to give the corporation a first lien on the stock for the payment of all obligations owing the corporation, and the

principal obligation is, of course, the payment of the monthly assessment. The lien in favor of the corporation would exist whether the stock was deposited in escrow for plaintiff's benefit or was held in possession absolutely by him. We think the terms of the contract between the parties must control, and it is utterly impossible by any fair construction to hold that defendant was to deliver 840 shares of the stock absolutely to plaintiff.

We hold that the offer of defendant to place this stock in escrow conformed to the requirements of the contract; that upon this record it conclusively appears that plaintiff, and not defendant, was in default in performing the provisions of the contract; that the finding of the court is clearly against the preponderance of the evidence and contrary to the law; that the judgment should therefore be reversed with a finding of facts and a judgment of *nil capiat* in favor of defendant.

*Reversed with a finding of facts and a judgment of nil capiat in favor of defendant.*

McSurely and O'Connor, JJ., concur.

Finding of facts: We find as facts that plaintiff and defendant entered into the written contract which appears in the evidence of this case as Plaintiff's Exhibit No. 1; that defendant has at all times been willing and able to comply with all things that he agreed to perform under the terms and covenants of said contract; that plaintiff without cause refused to abide by and perform the agreements and covenants undertaken by him under the terms of said contract; that he is therefore not entitled to recover against defendant and that a judgment of *nil capiat* should be entered in this court in favor of defendant.